# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Arlander Keys | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 6894 | **DATE** | 8/12/2004 |
| **CASE TITLE** | Larry K. Maynard vs. Jo Anne B. Barnhart | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] The Court grants Plaintiff's Motion for Summary Judgment~~(#15-1)~~ and denies the Commissioner's Motion for Summary Judgment (#20-1). This matter is remanded to the Commissioner for further proceedings consistent with this opinion. *AK*

(11) x [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | **Document Number** |
| | Notices mailed by judge's staff. | | AUG 1 3 2004 | |
| | Notified counsel by telephone. | | date docketed | 21 |
| ✓ | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | AUG 1 3 2004 | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| AC | courtroom deputy's initials | | Date/time received in central Clerk's Office | mailing deputy initials |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

LARRY K. MAYNARD, SR.          )
                               )
                Plaintiff      )      No. 03C6894
                               )
vs.                            )      Judge Arlander Keys
                               )
JO ANNE B. BARNHART,           )
COMMISSIONER OF                )
SOCIAL SECURITY,               )
                               )
                Defendant      )
                               )

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff, Larry K. Maynard, Sr., moves this Court for Summary Judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, to reverse the final decision of the Commissioner of Social Security (the "Commissioner"), which denied his claim for Disability Insurance Benefits ("DIB"). *See* 42 U. S. C. § 405(g), 1383(c) (West 2004). In the alternative, Plaintiff seeks an order remanding the case to the Commissioner for further inquiry and evidence. The Commissioner has filed a Cross-Motion for Summary Judgment, which requests this Court to affirm its final decision. For the reasons set forth below, this Court reverses and remands the Commissioner's decision.



## PROCEDURAL HISTORY

On September 15, 2000, Plaintiff filed two applications with the Social Security Administration ("SSA"): (1) an application for DIB, claiming that a bulging disc on his spine rendered him disabled as of April 26, 2000, (R. at 55-57, 69.); and (2) an application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. (R. at 225.) On November 20, 2000, the SSA denied both applications, stating that Plaintiff still had the ability to perform light work, despite his medical condition (R. at 230.)

Plaintiff disagreed with the SSA's decision, and on January 16, 2001, Plaintiff filed a "Request for Reconsideration" with the SSA for both the DIB claim, (R. at 35-36.), and the SSI claim. (R. at 234-37.) On April 12, 2001, the SSA reaffirmed its denial of Plaintiff's claims.

On December 26, 2002, the Administrative Law Judge ("ALJ"), Michael G. Logan, issued an unfavorable decision, concluding that Plaintiff was not disabled, because Plaintiff lacked "objective signs of a disabling back condition." (R. at 14-23.)

On January 6, 2003, Plaintiff filed a request with the Appeals Council to review the ALJ's December 26, 2002 decision. (R. at 13A.) The Appeals Council denied Plaintiff's request for review on July 31, 2003, concluding that Plaintiff's grounds for disagreement did not warrant changing the ALJ's decision. (R.

at 6-9.) As a result, the ALJ's decision stands as the final judgment of the Commissioner, and is now the subject of the motions before the Court. (R. at 6.)

## STATEMENT OF FACTS

### A. Evidence Presented at Plaintiff's Hearing

#### 1. Plaintiff's Testimony

At the hearing on October 18, 2002, Plaintiff, a forty-three-year-old male, testified that he had been married for twenty-five years, and has four sons. (R. at 252, 290.) Two of his grandchildren live with Plaintiff and his wife. (R. at 252.) Plaintiff testified that he was recently evicted from his home, and now he and his family reside in temporary housing. (R. at 253.) Plaintiff testified that he recently gained 20 pounds, claiming that his condition prevented him from enjoying activities such as football and basketball. (R. at 252.) Plaintiff has not possessed a driver's license for the past 20 years. (R. at 254.) Plaintiff explained that his inability to read prevented him from taking a written driver's examination. (Id.) Plaintiff attended school for twelve years, focused on vocational courses (e.g., painting and sanding for body fender repair work), and received a diploma. (R. at 254-55.) Plaintiff testified that he is illiterate. (R. at 279.)

For the last seventeen years, Plaintiff worked as a batch maker for Crofton Laboratory, a paint manufacturer. (R. at 257.) This job typically required Plaintiff to stand all day, to lift bags weighing anywhere from 25 to 100 pounds, to move these bags from a pallet to a machine, and to turn drums weighing between 500 to 700 pounds. (R. at 257-59.)

On April 26, 2000, Plaintiff fell three times at work. (R. at 259-60.) Despite experiencing pain, Plaintiff continued working, and visited the doctor at the end of the workday. (R. at 260.) Plaintiff informed the doctor that the pain from the three falls worsened an existing pain he had been experiencing for a couple of years. (R. at 261.) Plaintiff has not worked full time since the April 26, 2000 injury. (Id.) Plaintiff sold "snowballs" during the Summer of 2000 to earn extra money, but had to quit after three days due to his inability to lift twenty-five and fifty pound bags of ice. (Id.)

Plaintiff testified that he experienced pain in his lower back, above his buttocks, and in his buttocks. (R. at 263.) Plaintiff testified that his pain level gets as high as "nine" (on a scale from zero to ten, with ten being the highest pain) and as low as "five," depending on the amount of physical activity (e.g., mopping a floor or washing his face is very high, but sleeping is a five). (R. 265-66.) Plaintiff also experiences headaches, and wakes up in the morning with his arms

4

and hands feeling numb. (R. at 263.) Plaintiff wears a back brace when out on family outings or out walking, even though he can only walk a few blocks before stopping. (R. at 267.) Plaintiff takes Vicodin and Ibuprofen, as well as several other antidepressants. (R. at 264.) Plaintiff testified that, without pain medication, he could stand or walk one and one half hours during an 8-hour period, as well as sit for one and one half hours during the day. (R. at 270-71.) Plaintiff testified that his medication can make him dizzy or drowsy. (Id.) Plaintiff experienced pain in his back during the hearing, causing him to stand up a few times, as well as sit in a crooked position, which the ALJ observed. (R. at 270.) Plaintiff spends about twelve hours of each day sleeping. (R. at 272.)

Plaintiff testified that a neurosurgeon informed him that he did not require surgery, yet he still complained of pain. (R. at 265.). Plaintiff testified that his current medical doctor was Dr. Mahesh Shah (R. at 268.) Plaintiff also received treatment from Dr. Mitchell Goldflies, a medical doctor referred by Crofton Laboratory, and Dr. Valentin Berman, a psychiatrist. (R. at 268-69.) Plaintiff testified that he had two MRIs, one in May 2000 and one in September 2001. (R. at 283.)

## 2. Vocational Expert's Testimony

Julie L. Bose, the vocational expert ("VE"), described Plaintiff's work experience for the past fifteen years as that of a batch maker, which is an unskilled occupation with a heavy exertional level. (R. at 284-85.)

The ALJ presented three hypothetical questions to the VE. (R. at 285.) In Hypothetical A, the ALJ described a forty-three-year-old, functionally illiterate person with twelve years of education, who could execute simple, repetitive tasks; use his hands and fingers for both gross and fine manipulation for ninety percent of the workday; but would need to avoid unprotected heights and dangerous machinery. (R. at 285-86.) The ALJ told the VE to presume that this person would be able to lift up to fifty pounds occasionally and up to twenty-five pounds frequently, walk frequently during the workday, and stand frequently during the workday. (R. at 285) The VE concluded that this person would be unable to perform Plaintiff's past work as a batch maker due to the heavy work. (R. at 286.) However, the VE testified that this person could perform medium, unskilled positions, such as a bagger or industrial cleaner, with an estimated 8,000 to 10,000 jobs in the Chicago metropolitan area, and a laundry worker, with an estimated 6,000 to 8,000 jobs in the same geographical area. (R. at 286-87.)

In Hypothetical B, the ALJ limited the person described in Hypothetical A to using fine finger and gross hand manipulation for only sixty percent of the workday. (R. at 287.) The VE testified that this change would eliminate approximately seventy percent of the bagger positions, and approximately twenty percent of the laundry worker positions. (Id.)

In Hypothetical C, the ALJ further restricted the person in Hypothetical A, with the following limitations: standing for only one and one-half hours in an eight-hour workday, and sitting for one and one-half hours in an eight-hour workday. (Id.) The VE testified that, under these circumstances, there were no jobs available to this hypothetical worker. (R. at 288.)

Plaintiff's counsel inquired further about the VE's response to Hypotheticals A and B. (R. at 288-89.) The VE testified that if the individual needed to sit seven hours out of an eight-hour day at will, there would be no jobs available to the hypothetical person. (R. at 289.)

Plaintiff's counsel next described a functionally illiterate person limited to unskilled, sedentary work, but having the ability to sit or stand at will. (Id.) The VE testified that the jobs available to the person in this hypothetical would be completely eliminated if, for example, the person experienced pain that hindered the ability to perform assembling while standing. (Id.)

### 3. Medical Evidence

Plaintiff received treatment from several medical professionals from May 2000 to October 2002, following his fall at work on April 26, 2000.

#### Southwest Hospitals MRI Center

On May 9, 2000, Southwest Hospitals MRI Center performed a magnetic resonance imaging ("MRI") exam on Plaintiff. (R. at 72, 127.) Plaintiff experienced back pain during the procedure, which prevented the axial T1 images from being taken. (R. at 127.) The exam revealed a "mild diffuse annulus bulge which appear[ed] to be slightly asymmetric towards the left causing bilateral neural foraminal narrowing, left greater than right. (Id.) The L3-4 level and L5-S1 level were "unremarkable." (Id.)

#### Dr. Mitchell Goldflies, M.D.- Treating Physician

After Plaintiff's fall at work on April 26, 2000, Dr. Goldflies treated Plaintiff's low back pain about twice a month from May 2000 through August 2000. (R. at 136-42.)

Dr. Goldflies first examined Plaintiff on May 15, 2000, and concluded that Plaintiff had a lumbar sprain and dysfunction, but found no signs of neurological problems. (R. at 142.) Dr. Goldflies suggested physical therapy and manipulation of Plaintiff's spine, and noted that Plaintiff was currently disabled and off work. (Id.) On May 27, 2000, Dr. Goldflies noted that Plaintiff continued to experience low back pain. The

Doctor performed an examination that indicated lumbo-sacral paraspinous muscle tenderness, and prescribed a continuation of Plaintiff's medication. (R. at 141.) On June 10, 2000, Dr. Goldfies noted that Plaintiff complained of low back pain at night and had difficulty sleeping. (R. at 140). Dr. Goldflies performed an examination, which revealed the same injury, and prescribed Vicodin ES for nighttime pain relief. (Id.) On July 6, 2000, Dr. Goldflies suggested the use of a naprapath for soft tissue mobilization, because Plaintiff complained that the chiropractic treatment caused increasing spasm in his low back. (Id.) Dr. Goldflies prescribed Norflex and Vicodin ES. (Id.) Plaintiff remained off work. (Id.)

On July 22, 2000, Dr. Goldflies noted that Plaintiff complained of lower back pain radiating down to his right lower extremity. (R. at 138.) Dr. Goldflies prescribed Norflex and Vicodin ES; Plaintiff remained off work. (Id.) On August 5, 2000, Dr. Goldflies noted that Plaintiff complained of low back pain, which was worse in the morning and while Plaintiff was active, and suggested that Plaintiff progress to a "work hardening program," because the prescribed treatment had failed to improve Plaintiff's condition. (R. at 137.) On August 19, 2000, Dr. Goldflies noted that Plaintiff complained of increased low back pain with the discontinuation of physical therapy. (R. at 136.) During the examination, Dr. Goldfies recorded that

Plaintiff had a lumbar spine range of forty-five degrees of flexion, ten degrees of extension and twenty degrees of side bending. (Id.) Further, Dr. Goldflies observed Plaintff crying due to pain, and concluded that Plaintiff showed signs of a thoraco lumbar myofascial pain disorder. (Id.) Dr. Goldflies prescribed more Vicodin ES, and discharged Plaintiff from his care, because Plaintiff had reached maximum medical improvement ("MMI") without further treatment. (Id.)

In an October 6, 2000, letter to Plaintiff's counsel, Dr. Goldflies summarized his treatment of Plaintiff from May 15, 2000, to August 19, 2000, for lumbo-sacral sprain with secondary thoraco lumbar myofascial pain disorder. (R. at 131-33.) Dr. Goldflies remarked that Plaintiff had reached MMI for the work-related injury, and did not recommend further treatment. (R. at 133.) Dr. Goldflies concluded that Plaintiff was currently and totally disabled from employment, noting that Plaintiff had been off work while under his care and that Plaintiff's current condition was related to Plaintiff's April 26, 2000, injury. (Id.)

Almost two years later, on October 3, 2002, Dr. Goldflies completed an 8-page "Multiple Impairments Questionnaire," (R. at 217-24.), reiterating his position that Plaintiff was "totally disabled from employment." (R. at 217.) Dr. Goldflies stated that Plaintiff suffered from (1) lumbar sprain and dysfunction,

(2) secondary thoraco lumbar, myofascial pain disorder, (3) paraspinous muscle tenderness and hypertonicity in thoraco lumbar spine, (4) an angular bulge that was worse on the right than on the left at L4-5, (5) a pain level of nine, with nine being severe, (6) a level of fatigue of nine, with nine being severe, and (7) an inability to completely relieve the pain with medication, without unacceptable side effects. (R. at 217-219.) Dr. Goldflies reported that these findings were consistent with Plaintiff's symptoms of (1) severe back pain, (2) difficulty sleeping, and (3) crying due to back pain. (Id.)

**Dr. Thomas Toulis, D.C. – Treating Chiropractor**

Dr. Toulis treated Plaintiff several times during June 2000, addressing Plaintiff's complaints of lower back pain, neck pain, and leg pain following a fall at work on April 26, 2000. (R. at 116-23.) On June 6, 2000, Dr. Toulis noted Plaintiff's rate of pain as nine out of ten, describing it as sharp, throbbing, and constant. (R. at 122.) Plaintiff had been injuried at work about two years prior, but continued working. (Id.) Dr. Toulis further noted that the symptoms worsened when Plaintiff was sitting for thirty minutes, standing for five to ten minutes, walking two blocks, lifting more than five pounds, and lying down. (Id.) On the same day, Plaintiff's second MRI revealed "a right lumbar curve with an anterior translation in lumbar weight

bearing" and "restriction in left and lateral bending with lack of coupled motion." (R. at 126.)

On June 8, 2000, Dr. Toulis directed Plaintiff to ice three times a day for twenty minutes, in addition to prescribing spinal adjustments, to address Plaintiff's complaints of low back pain. (R. at 121.) Dr. Toulis treated Plaintiff in ten additional visits during June, changing his assessment from "no progress" at the beginning treatment to "slow progress" at the end, even though Plaintiff continued to make subjective complaints of lower back pain. (R. at 116-21.)

On August 15, 2000, Dr. Toulis completed a narrative report of Plaintiff's treatment for lumbar intervertebral disc – a diagnosis that Dr. Toulis based on Plaintiff's complaints of low back pain following his 2000 fall at work. (R. at 111-12.) Dr. Toulis reported that Plaintiff's neurological condition was within the normal limits. (R. at 111.) Dr. Toulis prescribed chiropractic manipulative therapy, physiotherapy in the form of interferential current, and rehabilitative exercises. (R. at 112.) Dr. Toulis indicated that Plaintiff made sporadic improvements, but further stated that Plaintiff's injury caused pain, and that it was subject to episodes of remission and exacerbation due to various aggravations. (Id.)

On October 10, 2000, Dr. Toulis completed a Spinal Disorders form for the Bureau of Disability Determination Services

("BDDS"), which is required to establish Plaintiff's eligibility under the Social Security Act. (R. at 113-15.) Dr. Toulis opined that Plaintiff was unable to work, responding to a question[1] that inquired about Plaintiff's ability to perform work-related activities. (R. at 115.)

### Dr. Mahesh Shah, M.D. – Treating Physician

Dr. Shah treated Plaintiff from October 2000 to October 2001. (R. at 157-73.) Dr. Shah addressed Plaintiff's complaint of low back pain, which began after Plaintiff's 2000 fall at work. (R. at 166.) Dr. Shah prescribed various medications (e.g., Ibuprofen, Vicodin) to address Plaintiff's lower back pain and back spasm, but the pain remained. (R. at 158-61.) Dr. Shah ordered an updated MRI, which was performed on September 7, 2001. (R. at 172.) The results indicated a normal MRI of Plaintiff's lumbar spine, revealing that Plaintiff's lumbar vertebrae and intervertebral discs appeared normal. (Id.) Dr. Shah last treated Plaintiff on October 16, 2001, at which time Plaintiff still complained of low back pain, despite the normal MRI impression of his spine. (R. at 157.)

On October 17, 2002, Dr. Shah stated that he treated Plaintiff for lumbar disc disease, and that Plaintiff could not

---

[1] Question 13 on the spinal disorders form from the BDDS asked, "Describe the patient's ability to do work-related activities such as sitting, standing, moving about, lifting, carrying, handling objects, hearing, speaking, traveling."

perform normal work that involved lifting weight over twenty pounds. (R. at 216.)

**St. Anthony Hospital**

St. Anthony Hospital provided rehabilitation services to Plaintiff from May 17, 2000, to August 8, 2000, based on a referral from Dr. Goldflies. (R. at 94-110.) On May 17, 2000, a physical therapist at the hospital noted that Plaintiff complained of low back pain, and that Plaintiff had a subjective pain intensity of eight on a scale from one to ten. (R. at 108-110.) Plaintiff received physical therapy approximately two times a week. (R. at 109.) Plaintiff later informed the physical therapist that he experienced worse pain after visiting his chiropractor. (R. at 103, 105.) On June 9, 2000, the physical therapist completed a progress report, noting that Plaintiff had moderate-to-severe low back pain. (R. at 104.) On July 21, 2000, the physical therapist indicated that Plaintiff experienced increased mobility and some pain-free movements. (R. at 98.) On August 2, 2000, the same physical therapist noted that, even though Plaintiff had been doing well for two to three weeks prior to this visit, Plaintiff still complained of low back pain after his naprapath performed soft tissue manipulative treatment. (R. at 96).

**Dr. Harry Bergman, M.D.**

On November 3, 2000, Dr. Bergman, a state physician, completed a Residual Functional Capacity ("RFC") Assessment based on the evidence in Plaintiff's file. (R. at 145-52.) Dr. Bergman determined that Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk about six hours in an eight-hour workday, and sit about six hours in an eight-hour workday. (R. at 146.) Dr. Bergman based his conclusions on Plaintiff's MRI, which showed an annular bulge that was worse on the right than on the left, at the L4-5 level. (R. at 152.)

On April 10, 2001, a medical consultant's review supported Dr. Bergman's physical RFC assessment of Plaintiff, considering Plaintiff's MRI dated May 9, 2000. (R. at 153-56.)

**Dr. Valentin Berman, M.D. – Treating Psychiatrist, and Bruce Robinson, CCSW – Licensed Clinical Social Worker**

Dr. Berman and Mr. Robinson alternated in providing treatment to Plaintiff from July 2001 through October 2002. (R. at 175-76.) Initially, the pair treated Plaintiff on an almost weekly basis. (Id.) Beginning on January 7, 2002, however, Dr. Berman and Mr. Robinson treated Plaintiff on a monthly basis. (Id.) Dr. Berman initially diagnosed Plaintiff with major depression, a learning disability, and severe back injury. (R.

at 206.)    Dr. Berman prescribed psychotherapy, and recommended
that Plaintiff see Mr. Robinson for treatment.  (R. at 207.)

Mr. Robinson first treated Plaintiff on July 26, 2001, and
made a similar diagnosis (i.e., major depression, single
episode).  Mr. Robinson also indicated that Plaintiff considered
himself a "dummy" and a failure in his marriage and with his
finances.  (R. 203.)    Throughout the treatments, Plaintiff did
experience periods of improvement.  (R. at 177-202.)    However,
Mr. Robinson noted that Plaintiff experienced ongoing stress from
factors such as difficulty in sleeping due to his back pain,
tensions with his wife, loss of his home, concerns about
homelessness, and concerns about his disability hearing.  (R. at
Id.)    On October 3, 2002, which was Plaintiff's last visit, Mr.
Robinson noted that Plaintiff did mention that he was talking
more to his wife and reaching out to his family for support.  (R.
at 177).

On October 7, 2002, Dr. Berman treated Plaintiff and
completed a "Psychiatric/Psychological Impairment Questionnaire."
(R. at 208-15.)    Dr. Berman reported a fair prognosis and that
Plaintiff had a current GAF [2] of fifty-eight, including the

_____

[2] GAF stands for Global Assessment of Functioning Scale.    A
score between 51 and 60 refers to moderate symptoms (e.g., flat
effect and circumstantial speech, occasional panic attacks) or
level of functioning (e.g., some difficulty in social or
occupational functioning such as few friends or contacts with co-
workers) moderate difficulty in social or occupational
functioning.  American Psychiatric Ass'n, <u>Diagnostic and</u>

highest GAF of sixty-five for the past year. (R. at 208.) However, Dr. Berman diagnosed Plaintiff as suffering from major depression. (Id.) Dr. Berman noted that Plaintiff experienced severe symptoms of helplessness/hopelessness, guilt/worthlessness, and loss of interest. (R. at 210.) Dr. Berman indicated that Plaintiff had a "markedly limited" ability to complete a normal workweek without interruptions, due to psychologically-based symptoms, and had a markedly limited ability to perform at a consistent pace, without an unreasonable number and length of rest periods. (R. at 212.)

However, Dr. Berman indicated that Plaintiff was *not* limited in the following areas: (1) ability to remember locations and work-like procedures, (2) ability to carry out simple one or two-step instructions, (3) ability to sustain ordinary routine without supervision, (4) ability to make simple work related decisions, (5) ability to ask simple questions or request assistance, and (6) ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (R. at 211-212.) Nonetheless, Dr. Berman noted that Plaintiff's psychiatric condition exacerbated his pain, explaining that "there appeared to be a relationship between Plaintiff's emotional pain, back pain, and ability to tolerate

Statistical Manual of Mental Disorders DSM-IV-TR (Text Revision) 32 (4th ed. 1994).

[pain]." (R. at 214.) Specifically, Dr. Berman opined that Plaintiff's impairment or treatment would likely cause Plaintiff to be absent from work more than three times a month. (R. at 215.)

### The ALJ's Decision

On December 26, 2002, the ALJ issued his decision, concluding that Plaintiff did not meet DIB or SSI requirements[3], and that Plaintiff's medical condition did not prevent him from participating in significant work activity. (R. at 18, 22.) The ALJ reviewed Plaintiff's testimony, the VE's testimony, and all the evidence of record. (R. at 18.)

The ALJ noted that there was no evidence that Plaintiff had engaged in gainful work activity since the onset of his alleged disability on April 26, 2000. (R. at. 18.) In assessing Plaintiff's RFC, the ALJ reported that Plaintiff testified to being able to only (1) stand and walk for no more than two hours during an eight-hour day, (2) walk no more than two blocks without pain, or (3) sit for five minutes before needing to stand. (Id.)

The ALJ acknowledged that Plaintiff suffered from severe physical impairments, considering the mild diffuse disc bulging at L4-5, as evident from an MRI in May 2000. (R. at 19.)

---

[3] Disability requirements are presented in Listing of Impairments of Appendix 1, Subpart P, Regulations No. 4.

Nonetheless, the ALJ concluded that Plaintiff lacked objective signs of a disabling back condition, because Plaintiff had a normal MRI of his lumber spine, which was performed in September 2001. (Id.) In addition, the ALJ determined that Dr. Goldflies' and Dr. Shah's progress notes lacked objective findings of disability, because their treatment notes of Plaintiff's back pain primarily revealed tenderness, hypertonicity, and some decreased motion. (Id.) As a result, the ALJ rejected Dr. Goldflies' assertion that Plaintiff was totally disabled from work, as well as Dr. Shah's and Dr. Bergman's independent assertions that Plaintiff could lift and carry no more than twenty pounds. (Id.) Moreover, the ALJ gave no weight to the opinion of chiropractor Thomas Toulis, because, in general, the ALJ considers the progress notes and reports of only licensed physicians when making the disability determination. (Id.)

Second, the ALJ stated that Plaintiff's complaints were not supported by the medical evidence, and that Plaintiff's medical condition lacked evidence of neurological deficits or muscle atrophy. (Id.) The ALJ then applied a reasonableness test to balance Plaintiff's complaints of pain, including the degree of pain that Plaintiff alleged, with the medical evidence and other significant factors (e.g., Plaintiff's daily activities, efforts to work, other evidence affecting ability to work). In

assessing Plaintiff's RFC, the ALJ noted that the state physicians did not have the benefit of reviewing the latest medical evidence or assessing the claimant's credibility at the hearing, without discussing why Plaintiff should be considered incredible, or identifying the relevant, recent medical records. (R. at 20.) The ALJ concluded that Plaintiff did not suffer a disabling condition, because his complaints of pain were not accompanied by the usual signs of pain, such as abnormal weight loss, muscle atrophy, problems concentrating, and hospital or emergency room visits. (R. at 19-20.) The ALJ concluded that Plaintiff had the ability to (1) work at the medium level of assertion, (2) lift and carry up to fifty pounds at a time or twenty-five pounds occasionally, and (3) work with sixty percent of the normal ability for gross and fine manipulation. (Id.)

Third, the ALJ noted that the record supported a diagnosis of major depression for Plaintiff. (Id.) Dr. Berman treated Plaintiff and prescribed therapy and medication. (Id.) However, the ALJ concluded that Plaintiff still lacked a disabling condition, because Plaintiff: (1) denied homicidal or suicidal thoughts, (2) exhibited no cognitive deficits, (3) suffered only mild restrictions on his ability to socialize, and (4) did not require a hospital or emergency room visit for depression. (Id.)

Further, the ALJ limited Plaintiff to simple and repetitive work, without dangerous machinery, and which could accommodate a person with only sixty percent of the normal ability for gross and fine manipulation. (R. at 21.)  In response to the ALJ's hypothetical question based on this work profile, the VE identified the following jobs that Plaintiff could perform in Illinois: 9,600 to 11,200 industrial cleaner positions; 2,400 to 3,000 bagger positions; and 4,800 to 6,400 laundry worker positions. (Id.)  Given the existence of these positions in significant numbers, the ALJ concluded that Plaintiff was not disabled,. (Id.)

### STANDARD OF REVIEW

In reviewing the ALJ's decision, the Court may not decide the facts, reweigh the evidence, or substitute its own judgment for that of the ALJ.  *Herron v. Shalala,* 19 F.3d 329, 333 (7th Cir. 1994).  Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the courts.  *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990); *see also Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989) (the ALJ has the authority to assess medical evidence and give greater weight to that which he finds more credible).  Rather, the Court must accept findings of fact that are supported by "substantial evidence," 42 U.S.C. § 405(g), where substantial evidence is

"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Herron*, 19 F.3d at 333 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

The Court is limited to determining whether the Commissioner's final decision is supported by substantial evidence and based upon proper legal criteria. *Ehrhart v. Sec'y of Health and Human Servs.*, 969 F.2d 534, 538 (7th Cir. 1992). This does not mean that the ALJ is entitled to unlimited judicial deference, however. The ALJ must consider all relevant evidence and may not select and discuss only that evidence that favors his ultimate conclusion. *Herron*, 19 F.3d at 333. In addition to relying on substantial evidence, the ALJ must articulate his analysis at some minimal level. *See Young v. Sec'y of Health and Human Servs.*, 957 F.2d 386, 393 (7th Cir. 1992) (ALJ must articulate his reason for rejecting evidence "within reasonable limits" in order for meaningful appellate review). The ALJ must build "an accurate and logical bridge" from the evidence to his conclusion. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

Finally, although Plaintiff bears the burden of demonstrating his disability, "[i]t is a basic obligation of the ALJ to develop a full and fair record." *Thompson v. Sullivan*, 933 F.2d 581, 585 (7th Cir. 1991) (*quoting Smith v. Sec'y of HEW*, 587 F.2d 857, 860 (7th Cir. 1978)). "Failure to fulfill this

obligation is 'good cause' to remand for gathering additional evidence." *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000) (finding that, if the ALJ found the evidence before him insufficient, he should have obtained more evidence.)

## SOCIAL SECURITY REGULATIONS

The Social Security Regulations prescribe a sequential five-part test for determining whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520 and 416.920 (2001). The ALJ must consider: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude gainful activity; (4) whether the claimant is unable to perform his past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy. *See* 20 C.F.R. §§ 404.1520 and 416.920; *see also Young*, 957 F.2d at 389. A finding of disability requires an affirmative answer at either step 3 or step 5. A negative answer at any step (other than step 3) precludes a finding of disability. *Id*. The claimant bears the burden of proof at steps 1-4, but the burden shifts to the Commissioner at step 5. *Id*.

The ALJ's analysis at step 5 typically involves an evaluation of the claimant's RFC to perform a particular category

of work (i.e. sedentary, light, medium, heavy, or very heavy work), in combination with an application of the Medical-Vocational Guidelines ("the Grid") to determine whether an individual of the claimant's age, education, and work experience could engage in substantial gainful activity. *See* 20 C.F.R. Part 404, Subpart P, Appendix 2. The Grid is a chart that classifies a claimant as disabled or not disabled, based on the claimant's physical capacity, age, education, and work experience. *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987). If the use of the Grid is appropriate, the Commissioner or ALJ may rely upon it for determining disability, and, in such a case, the Grid alone constitutes substantial evidence sufficient to uphold the decision of the Commissioner. *Id.*

However, where a plaintiff suffers from significant non-exertional impairments, the ALJ may not rely upon the Grid. *See* SSR 83-14. "When a plaintiff's non-exertional impairments significantly diminish his ability to work . . . the Commissioner must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which plaintiff can obtain and perform." *Bapp v. Bowen,* 802 F.2d 601, 603 (2d Cir. 1986).

## DISCUSSION

Plaintiff contends that the ALJ erred in concluding that he is not disabled. Specifically, Plaintiff argues that the ALJ

(1) failed to properly evaluate the medical evidence, and (2) erroneously relied on VE testimony that was provided in response to a flawed, unrepresentative hypothetical question.

## 1. Evaluation of the Medical Evidence

In support of his applications, Plaintiff presented evidence from his treating physicians tending to indicate that Plaintiff was impaired.  Dr Goldflies, Plaintiff's treating orthopedic physician, opined that Plaintiff was disabled and unable to work, and his treatment notes reflected Plaintiff's ongoing complaints of back pain.  Dr. Shah, Plaintiff's treating physician, noted that Plaintiff could not perform normal work that involved lifting weight over twenty pounds.  And Dr. Berman, Plaintiff's psychiatrist, estimated that, based on Plaintiff's impairment or treatment, Plaintiff would likely be absent from work more than three times a month.

Plaintiff argues that the ALJ failed to give controlling weight to these physicians' opinions.  Plaintiff contends that, once controlling weight was denied, the ALJ failed to evaluate the additional factors identified in *20 C.F.R § 1527(d)(2)* to determine the appropriate weight to give the medical opinions. This error was significant, Plaintiff argues, because it allowed the ALJ to "play doctor," despite the contrary opinions of Plaintiff's treating medical professionals.

A treating physician's opinion is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record. *20 C.F.R § 1527(d)(2); Clfford v. Apfel,* 227 F.3d 863, 870 (7th Cir. 2001). Conversely, if the ALJ denies controlling weight to a treating physician's opinion, the ALJ is required to identify the pertinent factors that justify this decision. *20 C.F.R § 1527(d)(2).* Applicable factors include: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) supportability (i.e., relevance of a source to support an opinion), (4) consistency (i.e., consistency of an opinion with the record as a whole), (5) specialization (i.e., medical specialist), and (6) other factors. *20 C.F.R § 1527(d)(2).*

The Commissioner contends that the ALJ had sufficient objective bases for discounting the medical opinions, because: (1) Plaintiff's most recent MRI (September 2001) was completely normal and the physicians' opinions of disability predated that MRI; (2) Plaintiff's treatment notes did not indicate neurological deficits or muscle atrophy; (3) Plaintiff was treated conservatively, meaning through medication and therapy, rather than hospitalization or emergency room visits; (4) the medical evidence did not support Plaintiff's subjective complaints of pain as a disabling back condition; and (5)

Plaintiff suffered only mild to moderate depression, and was able to remember and carry out simple instructions, as well as able to get along with co-workers. (Defendant's Brief at 20.)

The Court notes that Plaintiff's normal MRI, dated September 2001, was sufficient to deny controlling weight to Dr. Goldflies' opinion. Dr. Goldflies had last examined Plaintiff in August 2000, which was thirteen months before Plaintiff's normal MRI result. However, this MRI alone is insufficient to deny controlling weight to the opinions of Dr. Shah and Dr. Berman, because they treated Plaintiff and formed their opinions after September 2001. Because these physicians treated Plaintiff after the "normal" September 2001 MRI and still opined that Plaintiff was disabled – a determination, the Court notes, reserved for the Commissioner – it was inappropriate for the ALJ to deny controlling weight to these physicians on this basis.

The Court finds that the ALJ did not reasonably weigh the nature and extent of Plaintiff's medical treatment relationships as part of evaluating the opinion evidence. *See 20 C.F.R § 1527(d)(2)*. Dr. Shah, Plaintff's physician, treated Plaintiff six times from October 2000 through October 2001, which involved medication for back pain. Dr. Berman, Plaintiff's psychiatrist, and Bruce Robinson, Plaintiff's social worker, treated Plaintiff on nearly a monthly basis from July 2001 through October 2002, which involved therapy for depression, and its linkage to

Plaintiff's back pain. The ALJ must address these treatment relationships to avoid the appearance of "substituting his judgment for that of the medical [professionals]." *Rohan,* 98 F.3d at 971. Specifically, the ALJ failed to reconcile the record, because Plaintiff's complaints of pain to Drs. Shah and Berman continued after Plaintiff's recent MRI (2001), which was normal for Plaintiff's lumbar spine[4].

Next, the ALJ improperly discounted the extent of Plaintiff's subjective complaints. "Once a claimaint produces medical evidence of an underlying impairment, the Commissioner of Social Security may not discredit the claimant's testimony as to subjective symptoms merely because they are unsupportable by objective evidence." *Carradine v. Barnhart,* 360 F.3d 751,753 (7th Cir. 2004). In *Carradine*, the Court remanded to require the ALJ to assess the psychological origin of the severity of claimant Carrandine's pain, because of Carradine's long treatment history. *Id.* at 754-756.

---

[4] Further, despite the lack of neurological deficits and the use of conservative treatment, Dr. Shah still reported that Plaintiff complained of disabling pain, and that Plaintiff could lift or carry no more than twenty pounds. Similarly, Dr. Berman reported that Plaintiff's psychiatric condition exacerbated Plaintiff's pain. In light of this, the ALJ played doctor when he concluded that Plaintiff retained the capacity to perform slightly more exertionally demanding work, which he based on a lack of supporting objective evidence. The ALJ is proscribed from making this medical determination. *See Rohan v. Chater,* 98 F.3d 966, 970 (7th Cir. 1996) ("ALJ must not succumb to the temptation to play doctor and maker of their own independent medical findings").

Similarly, in Plaintiff's case, the ALJ recognized that Plaintiff had "an underlying medically determinable impairment [i.e., back injury] that could reasonably cause the symptoms [i.e., pain] alleged." (R. at 19.) Nonetheless, the ALJ stated, in a conclusory manner, that "the medical evidence [did] not support these symptoms to the degree alleged by [Plaintiff]." (Id.) Although the ALJ cited Social Security Ruling 96-7p [5] as the framework for his analysis, he did not address the frequency and intensity of Plaintiff's subjective complaints. *See* *Clifford,* 227 F.3d at 872 (noting that the ALJ's cursory statements were insufficient to facilitate appellate review). Nor did the ALJ attempt to reconcile this conclusion with Dr. Berman's opinion that Plaintiff's psychiatric condition exacerbated Plaintiff's pain.

Further, the ALJ's analysis of Plaintiff's mental impairment has flaws. "[M]ore weight is generally given to the opinion of a treating physician because of his greater familiarity with the

[5] SSR 96-7p requires an ALJ to address the following factors: 1) Plaintiff's activities of daily living; 2) the location, duration, frequency, and intensity of pain or other symptoms; 3) factors that precipitate or aggravate the symptoms; 4) what medications Plaintiff takes to alleviate pain or other symptoms, in what dosage, and with what effectiveness and side effects; 5) what treatment, other than medication, Plaintiff undergoes or has undergone to alleviate pain or other symptoms; 6) measures other than treatment Plaintiff uses or has used to relieve pain or other symptoms (e.g., lying flat on his back, standing for 15 to 20 minutes every hour, or sleeping on a board); and 7) other factors concerning Plaintiff's functional limitations and restrictions due to pain or other symptoms.

claimant's conditions and circumstances," unless substantial evidence proves otherwise. *Clifford,* 227 F.3d at 870. An ALJ must not "select and discuss only that evidence that favors his ultimate conclusion." *Herron v. Shalala,* 19 F.3d 329, 333 (7th Cir. 1994). Here, the ALJ correctly noted that Dr. Berman indicated mild to moderate limitations in Plaintiff's mental capacity to work. However, Dr. Berman also noted that Plaintiff had a markedly limited ability to complete a normal workweek without interruptions due to psychologically based symptoms, and would be absent from work three or more times per month. Yet, the ALJ accepted the former opinion and discounted this latter opinion.

Moreover, Dr. Berman opined that Plaintiff's psychiatric condition exacerbated pain, explaining that there appeared to be a relationship between Plaintiff's emotional pain, back pain, and ability to tolerate to pain. Nonetheless, the ALJ concluded that the record did not reflect the possibility that Plaintiff would miss many days from work. The ALJ fails to cite to any medical evidence in the record to support his conclusion. Therefore, the Court finds that the ALJ erred by failing to point to evidence to rebut Dr. Berman's opinion. *See Gudgel v. Barnhart,* 345 F.3d 467, 470 (noting that "[s]ubstantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion").

30

In short, the ALJ did not fully explain why Plaintiff's subjective complaints were not credible, and why Plaintiff's treating physicians' opinions were not controlling. On remand, the ALJ must reevaluate Plaintiff's complaints of pain and the relevant medical opinions after the 2001 MRI, to "build an accurate and logical bridge from the [medical] evidence to the [ALJ's] conclusion." *Clifford,* 227 F.3d at 872.

### 2. Reliance on the VE's Response to a Hypothetical Question

Plaintiff next argues that the ALJ improperly relied on the VE's response to a flawed hypothetical in concluding that Plaintiff was not disabled. Specifically, the ALJ's second hypothetical to the VE described a person with the capability to (1) execute simple, repetitive tasks; (2) use his hands and fingers for both gross and fine manipulation for sixty percent of the workday; (3) lift up to fifty pounds occasionally, and up to twenty-five pounds frequently, and (4) walk frequently and stand frequently during the workday. The VE testified that such a person could perform medium, unskilled positions, which existed in sufficient numbers in the national economy. The Plaintiff argues that the hypothetical did not accurately reflect his work-related limitations, noting that his physicians found that Plaintiff's ability to perform work was sufficiently more restricted.

The Commissioner counters that the ALJ had ample basis for rejecting the more restrictive limitations that Plaintiff's doctors imposed, because the objective medical evidence does not support their opinions. Specifically, the Commissioner notes that the ALJ concluded that Plaintiff could lift and carry up to fifty pounds at a time or twenty-five pounds occasionally, and claims the ALJ's conclusion was consistent with the medical evidence in the record.

Here, the ALJ referred to the record in concluding that Plaintiff could lift and carry up to fifty pounds at a time or twenty-five pounds occasionally, but the ALJ did not point to medical evidence supporting this fact[6.] While Dr. Shah opined that Plaintiff could lift and carry up to twenty pounds, the ALJ previously disavowed this evidence, claiming that it lacked supporting objective evidence. Specifically, the ALJ determined that Plaintiff's recent normal September 2001 MRI (2001) rendered Dr. Shah's opinion moot. However, the ALJ fails to acknowledge that Dr. Shah was not only aware of the normal September 2001 MRI, Dr. Shah ordered the September 2001 MRI. Dr. Shah concluded that Plaintiff's functional capacity was restricted *despite* the normal MRI - not in ignorance of it.

---

[6] The ALJ's hypothetical to the VE referenced a person who could lift twenty-five pounds *frequently;* however, the ALJ concluded Plaintiff could lift twenty-five pounds *occasionally.*

The ALJ's conclusion must reconcile significant evidence that would support an opposite result. *See Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). In light of Dr. Shah's opinion that Plaintiff was significantly restricted, the ALJ's conclusory statement that "[Plaintiff] retain[ed] the capacity to perform slightly more exertionally demanding work" is insufficient to satisfy this burden. (R. at 19.) Thus, the Court agrees that the ALJ's hypothetical to the VE was not supported by substantial evidence.

In short, the ALJ failed to provide a logical connection from the medical evidence to his conclusion at step five of the disability analysis. In particular, the ALJ failed: (1) to identify the specific evidence that supported his conclusion that Plaintiff could perform work in the national economy, and (2) to explain why Dr. Shah's medical opinion should not be granted controlling weight, given that his evaluation was performed after Plaintiff's most recent MRI (September 2001). On remand, the ALJ must address these gaps in his analysis.

## CONCLULSION

For the reasons, set forth above, the Court finds that the ALJ failed to build an accurate and logical bridge between the record and his conclusion that Plaintiff was not disabled, and could perform a substantial number of jobs in the national economy. Specifically, the ALJ failed to reconcile Plaintiff's

complaints of pain after Plaintiff's most recent MRI, which was normal. Accordingly, the Court grants Plaintiff's Motion for Summary Judgment, and denies the Commissioner's Motion for Summary Judgment. This matter is remanded for further proceedings consistent with this opinion.

Dated: August 12, 2004          E N T E R:

_____
ARLANDER KEYS
United States Magistrate Judge